**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | | |
|---|---|---|
| **BRITTANY GUILLOT** | * | **CIVIL ACTION NO. 3:20-CV-1537** |
| *Plaintiff* | * | |
| | * | |
| **VERSUS** | * | |
| | * | **JUDGE TERRY A. DOUGHTY** |
| | * | |
| **JAY RUSSELL, ET AL.** | * | **MAGISTRATE KAYLA MCCLUSKY** |
| *Defendants* | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

FACTS ............................................................................................................................... 1

LAW AND ANALYSIS ...................................................................................................... 6

A.  Summary Judgment Standard .................................................................................. 6

B. Defendants cannot be found liable in this matter under any federal claim ............... 8

C. Pat Johnson cannot be sued in an official capacity context ..................................... 11

D. OCC's suicide prevention policy is not unconstitutional.......................................... 13

E. Defendants were not deliberately indifferent to Blake Powell's needs under a theory of supervisory liability or any other theory ...................................................................... 16

F. Plaintiff does not have a valid claim for a failure to train or supervise.................... 19

G. Prison officials were not aware Decedent posed a suicide risk ................................ 23

H. Defendants are entitled to qualified immunity......................................................... 26

I. Plaintiff's Louisiana state law claims must also fail ................................................ 30

CONCLUSION.................................................................................................................. 33

CERTIFICATE OF SERVICE ...........................................................................................35

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | | |
|---|---|---|
| **BRITTANY GUILLOT** | * | **CIVIL ACTION NO. 3:20-CV-1537** |
| *Plaintiff* | * | |
| | * | |
| **VERSUS** | * | |
| | * | **JUDGE TERRY A. DOUGHTY** |
| | * | |
| **JAY RUSSELL, ET AL.** | * | **MAGISTRATE KAYLA MCCLUSKY** |
| *Defendants* | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

## TABLE OF AUTHORITIES

**Statutes**
LSA-C.C. art. 2315 ...................................................................................................... 30

**Other Authorities**
La. Const. Art. 5, § 27 ............................................................................................. 11, 12

**Rules**
Fed. R. Civ. P. 56(a) ...................................................................................................... 6

Fed. R. Civ. P. 56(c)(3) ................................................................................................. 7

**Federal Cases**
*Anderson v. Creighton,*
    483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ...................................... 28

*Anderson v. Dallas Cty. Tex.,*
    286 F.App'x 850 (5th Cir.2008) ......................................................................... 21

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ..................................... 6.7

*Ashcroft v. Iqbal,*
    556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ..................................... 10

*Bazan v. Hidalgo County,*
    246 F.3d 481 (5th Cir. 2001) .............................................................................. 27

*Bennett v. City of Slidell,*
    735 F.2d 861 (5th Cir. 1984) ................................................................................ 9

*Bennett v. Pippin*,
  74 F.3d 578 (5th Cir. 1996) ............................................................................ 9

*Burge v. Parish of St. Tammany*,
  187 F.3d 452 (5th Cir. 1999) .......................................................................... 8

*Burge v. St. Tammany Parish*,
  336 F.3d 363 (5th Cir. 2003) .......................................................................... 9

*Burns v. City of Galveston, Tex.*,
  905 F.2d 100 (5th Cir. 1990) ........................................................................ 22

*Carter v. Firth*,
  2018 WL 1597742  (W.D.La. April 2, 2018) ............................................... 11

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................... 6, 7

*City of Canton, Ohio v. Harris*,
  489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ....................... 14, 20

*City of St. Louis v. Praprotnik*,
  485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) ................................. 11

*Cleveland v. Bell*,
  938 F.3d 672 (5th Cir. 2019) ........................................................................ 27

*Club Retro, LLC v. Hilton*,
  568 F.3d 181 (5th Cir. 2009) ........................................................................ 27

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ........................... 27

*Colle v. Brazos County, Tex*,
  981 F.2d 237 (5th Cir. 1993) .......................................................................... 9

*Collier v. Montgomery*,
  569 F.3d. 214 (5th Cir. 2009) ....................................................................... 27

*Connick v. Thompson*,
  563 U.S. 51, 131 S.Ct. 1350, 179 L.Ed.2d 415 (2011) .......................... 20, 21

*Cope v. Cogdill*,
  3 F.4th 198 (5th Cir. 2021) ........................................................................... 28

*Craig v. St. Martin Parish Sheriff*,
  861 F.Supp. 1290 (W.D.La. 1994) ............................................................... 11

*Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co.*,
  671 F.3d 512 (5th Cir. 2012) ............................................................... 7

*Doe v. Taylor ISD*,
  15 F.3d 443 (5th Cir.1994) ................................................................. 29

*Domino v. Texas Dept. Of Criminal Justice*,
  239 F.3d 752 (5th Cir. 2001) ............................................................. 18

*Estate of Davis ex rel McCully v. City of North Richland Hills*,
  406 F.3d 375 (5th Cir. 2005) ............................................................. 10

*Estate of Pollard v. Hood County, Tex.*,
  579 Fed.Appx. 260 (5th Cir. 2014) ............................................... 29, 30

*Evans v. City of Marlin, Tex.*,
  986 F.2d 104 (5th Cir. 1993) ........................................................ 21, 22

*Farmer v. Brennan*,
  511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) .......... 16, 18, 21, 22

*Flores v. County of Hardeman*,
  124 F.3d 736 (5th Cir. 1997) ............................................................. 24

*Frazier v. Keith*,
  707 F.App'x 823 (5th Cir. 2018) ........................................................ 18

*Gates v. Texas Dep't of Prot. & Reg. Servs.*,
  537 F.3d 404 (5th Cir.2008) .............................................................. 29

*Glasper v. Guzman*,
  Civil Action No. 06-2040, 2009 WL 1507568  (E.D.La. 5/27/09) ............ 8

*Glenn v. City of Tyler*,
  242 F.3d. 307 (5th Cir. 2001) ............................................................ 27

*Hafer v. Melo*,
  502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d. 301 (1991) ..................... 11, 26

*Hamilton v. Segue Software, Inc.*,
  232 F.3d 473 (5th Cir. 2000) .............................................................. 7

*Hare v. City of Corinth, Miss*,
  74 F.3d 633 (5th Cir. 1996) ........................................................... 3, 16

*Harris v. Brown*,
  2021 WL 5822100 (W.D.La. November 22, 2021) ............................... 11

*Hinojosa v. Livingston,*
  807 F.3d 657 (5th Cir. 2015) ............................................................ 18

*Hughes v. Tabacco Inst., Inc.,*
  278 F.3d 417 (5th Cir. 2001) ............................................................ 10

*Jett v. Dallas Independent School Dist.,*
  491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) .................... 12

*Johnson v. Richland Par. Det. Ctr.,*
  2019 WL 3026987 (W.D. La. June 19, 2019) .................................... 12

*Jones v. Greninger,*
  188 F.3d 322 (5th Cir. 1999) ............................................................ 10

*Jones v. St. Tammany Parish Jail,*
  4 F.Supp.2d 606 (E.D. La.,1998) ...................................................... 12

*Joseph ex rel. Estate of Joseph v. Bartlett,*
  981 F.3d 319 (5th Cir. 2020) ............................................................ 28

*Kentucky v. Graham,*
  473 U.S. 159, 105 S.Ct. 3099, 876 L.Ed.2d 114 (1985) .................... 11

*Kisela v. Hughes,*
  —— U.S. ——, 138 S. Ct. 1148, 200 L.Ed.2d 449 (2018) ................ 29

*Little v. Liquid Air. Corp.,*
  37 F.3d 1069 (5th Cir. 1994) .............................................................. 7

*Malley v. Briggs,*
  475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) .................. 27, 28

*McConney v. City of Houston,*
  863 F.2d 1180 (5th Cir. 1989) .......................................................... 10

*Mendenhall v. Riser,*
  213 F.3d 226 (5th Cir. 2000) ............................................................ 27

*Monell v. Dept. of Social Servs. of City of New York,*
  436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed. 2d 611 (1978) .................... 9, 11

*Mullenix v. Luna,*
  577 U.S. 7, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) ........................ 28

*Murray v. Town of Mansura,*
  76 Fed.App'x 547 (5th Cir. 2003) ...................................................... 9

*Nichols v. McKelvin,*
  52 F.3d 1067 (5th Cir. 1995) ............................................................ 4

*Olabisionotosho v. City of Houston,*
  185 F.3d 521 (5th Cir. 1999) ........................................................... 16

*Oladipupo v. Austin,*
  104 F.Supp.2d 654 (W.D. La. 2000) ................................................ 12

*Oliver v. Scott,*
  276 F.3d 736 (5th Cir. 2002) ........................................................... 26

*Passerrello v. Sumner,*
  Civil Action No. 3:09-1916, 2013 WL 4590618 (W.D.La 8/28/13) ......................................... 8

*Pearson v. Callahan,*
  555 U.S. 223,129 S.Ct. 808, 172 L.Ed.2d. 565 (2009) ................................. 27

*Perez v. Richland Par. Det. Ctr.,*
  2019 WL 6038031 (W.D. La. Oct. 24, 2019)........................................... 12

*Pierce v. Smith,*
  117 F.3d 866 (5th Cir. 1997) ........................................................... 28

*Pineda v. City of Houston,*
  291 F.3d 325 (5th Cir. 2002) ........................................................... 18

*Piotrowski v. City of Houston.,*
  237 F.3d 567 (5th Cir. 2001) ..................................................... 13, 14

*Porter v. Epps,*
  659 F.3d 440 (5th Cir. 2011) ........................................................... 29

*Reimer v. Smith,*
  663 F.2d 1316 (5th Cir. 1981) ......................................................... 14

*Roberts v. City of Shreveport,*
  397 F.3d 287 (5th Cir. 2005) ........................................................... 19

*Sibley v. Lemaire,*
  184 F.3d 481 (5th Cir. 1999) ........................................................... 17

*Sims v. Adams,*
  537 F.2d 829 (5th Cir. 1976) ........................................................... 21

*Smith v. Blue,*
  35 Fed.App'x 390 (5th Cir. 2002) .................................................... 25

*Spiller v. City of Tex. City Police Dept.*,
  130 F.3d 162 (5th Cir. 1997) ............................................................ 8

*Stahl v. Novartis Pharm. Corp.*,
  283 F.3d 254 (5th Cir. 2002) ......................................................... 6, 7

*Taylor v. Bayou Corr. Center*,
  2021 WL 6118739 (W.D.La. December 7, 2021) ............................ 18

*Thompkins v. Belt*,
  828 F.2d 298 (5th Cir. 1987) ........................................................ 19

*Thompson v. Upshur County, Tx*,
  245 F.3d 447 (5th Cir. 2001) ........................................................ 28

*Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*,
  229 F.3d 478 (5th Cir. 2000) .......................................................... 9

*Webb v. Town of St. Joseph*,
  925 F.3d 209 (5th Cir. 2019) ........................................................ 14

*Webster v. City of Houston*,
  735 F.2d 838 (5th Cir. 1992) ..................................................... 9, 10

*White v. Pauly*,
  ─── U.S. ───, 137 S. Ct. 548, 196 L.Ed.2d 463 (2017) ................. 29

*Whitt v. Stephens Cty.*,
  529 F.3d 278 (5th Cir. 2008) ........................................................ 22

*Williamson v. Garber*,
  2020 WL 1244597 (W.D.La. February 5, 2020) ............................. 12

*Willis v. Cleco Corp.*,
  749 F.3d 314 (5th Cir. 2014) ..........................................................7

**Louisiana Cases**
*Arledge v. Sherrill*,
  32,189 (La. App. 2 Cir. 8/18/99); 738 So.2d 1215 .......................... 27

*Hill v. Lundin & Associates*,
  260 La. 542, 256 So.2d 620 (1972) ............................................... 31

*Leonard v. Torres*,
  2016-1484; (La. App. 1 Cir. 9/26/17); ---So.3d---, 2017 WL 4301898 .................... 32, 33

*Mart v. Hill*,
  505 So.2d 1120 (La.1987) ............................................................. 31

*Mathieu v. Imperial Toy Corp.*,
  94-0952 (La. 11/30/94), 646 So.2d 318 .............................................................. 31

*Misenheimer v. West Baton Rouge Parish Sheriff's Office*,
  95-CA-2427; (La. App. 1 Cir. 6/28/96); 677 So.2d 159 ................................. 32, 33

*Roberts v. Benoit*,
  605 So.2d 1032 (La.1991) ................................................................................. 31

*Scott v. State,*
  618 So.2d 1053 (La.App. 1 Cir.1993), *writ denied*, 620 So.2d 881 (La.1993) ........................ 31

Louisiana Revised Statutes
La.Rev.Stat. 33:1435 ......................................................................................... 12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| **BRITTANY GUILLOT** | * | **CIVIL ACTION NO. 3:20-CV-1537** |
| *Plaintiff* | * | |
| | * | |
| **VERSUS** | * | |
| | * | **JUDGE TERRY A. DOUGHTY** |
| | * | |
| **JAY RUSSELL, ET AL.** | * | **MAGISTRATE KAYLA MCCLUSKY** |
| *Defendants* | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

Now come Defendants, Jay Russell, Sheriff of Ouachita Parish, and Pat Johnson who, through undersigned counsel, file the instant Memorandum in Support of their accompanying Motion for Summary Judgment. For the reasons more fully listed below, summary judgment should be granted in Defendants' favor insofar as there is no genuine issue of material fact and judgment should be rendered as a matter of law.

### I. FACTS

This action pertains to the sudden and unexpected suicide of former Ouachita Correctional Center ("OCC") inmate Blake Powell ("Decedent" or "Powell"). T.A.G., who is allegedly Powell's minor child, has brought this lawsuit through his mother, Brittany Guillot ("Plaintiff"). Decedent, while in an isolation cell on March 13, 2020, due to his having stabbed another Ouachita Correctional Center OCC inmate, committed suicide in his cell by hanging himself.[1] Defendants contend that neither they, nor any OCC employee, had any notice whatsoever that Decedent intended to harm himself prior to his death. In fact, the evidence shows that Plaintiff herself did not suspect Decedent was a harm to himself and was shocked that he committed suicide.

---

[1] R. Doc. 1, ¶¶ 8-9.

1

A truncated version of Decedent's most recent incarceration history in OCC is as follows: Decedent was transported to OCC on November 9, 2019 and died on March 13, 2020.  During that time period, Decedent had expressed suicidal ideations for which he was placed on suicide watch several times.  This timeline was examined by Investigator Christopher Hill during his deposition testimony:

> Q:   So he was arrested on 11/9/19 and put on suicide watch in B36.  Within this note, this report that you note here, is there any information on why he was put on suicide watch or who made that determination?
> A:   Let me look.
>
> Q:   Okay.
> A:   In this report, the report listed the 2019 00003605.  It seems he made a statement to Corporal Irving, booking deputy, that he asked the victim of his burglaries to kill him and said at that point they placed him on suicide watch.[2]
>
> …
>
> Q:   Okay.  Let's see.  So we go—so we never—you cannot determine when he was taken off [suicide watch] and I know we've established that.  But we jump down here to 1/23 of '20 that Blake contacts deputies from his cell claiming to be suicidal and he's put on suicide watch.
> So any—can you kind of expand upon that?  Is there any information in that report, any facts—
> A:   Let me find one…[i]t appears Mr. Powell contacted the deputy through the speaker box.  Deputy Heron claiming that he was suicidal.  The deputy went to the isolation cell where he was held and Mr. Powell had all his things packed up, ready to go and then moved him to B1 and started a suicide log.[3]

The November 9, 2019 January 23, 2020 incidents are the only dates Decedent claimed to be suicidal and, in response, OCC employees took the appropriate response of placing him under suicide watch.   However, OCC employees were so vigilant in their duties they once placed Decedent under heightened observation based on the *suspicion* he might be suffering from mental health issues:

---

[2] See Exhibit A, pages 27-28.
[3] *Id.*, pages 31-32.

Q:      Okay.  And then we're looking at 2/18/20 at the very bottom of this page.
Blake moved to cell B38 for strange behavior and having abrasions on his
wrist.  Does that report that you're reviewing give us any more details?

A:      Said the deputy noticed that Powell was acting distant and had a blank stare.
He noticed some abrasions on the wrist.  He was taken to medical for
observation for evaluation where he was seen—let's see—he was seen by
Deputy George and placed in B38 for observation until he got put on the list
to see Dr. Boyle.[4]

Despite these actions and a complete lack of evidence Powell indicated he was suicidal at

the time he killed himself, Plaintiff has maintained this action.  Her theory of the case appears to

be that because Decedent had expressed suicidal ideations in the past, Defendants knew or should

have known Decedent posed a danger to himself on March 13, 2020.[5]  This is incorrect from both

a factual and legal standpoint.  No OCC employee who was working in Decedent's assigned

dormitory the evening he committed suicide had any notice that Decedent posed a risk of

substantial harm to himself.[6]  "[T]he correct legal standard is not whether the jail officers 'knew

or should have known,' but whether they had gained actual knowledge of a substantial risk of

suicide and responded with deliberate indifference."  *Hare v. City of Corinth, Miss*, 74 F.3d 633,

650 (5th Cir. 1996).

The following individuals were the only individuals assigned to B-Dorm, which is where

Decedent was assigned on March 13, 2020, the night he killed himself:  Deputy Webb Crecink; 2)

Lieutenant Richie Varino; 3) Corporal Daryl Wells; 4) Deputy Roy Mclendon; 5) Deputy Brian

Milstead; 6) Corporal Vance Whitton; and 7) Deputy Ethan Bonner.[7]  Powell did not express intent

of self-harm to any of the aforementioned individuals, nor did they have any reason to believe

---

[4] *Id*., pages 34-35.
[5] R. Doc. 29, ¶ 18(A).
[6] See Exhibits B-H, Affidavits of the Deputies who were either working in or have visibility to Decedent's
dormitory on the night he died.
[7] *Id.*

Powell was at imminent risk of committing suicide.[8]  The same holds true for Sheriff Jay Russell and Pat Johnson, but to an even greater extent.  Neither Defendant is alleged to have had any interaction with Decedent on March 13, 2020, and they are being sued in the capacity of policymakers and/or under a theory of supervisory liability.  However, given Plaintiff's express disavowal of any and all individual capacity claims, Defendants submit that no claim for supervisory liability actually lies in this matter.  *See, e.g., Nichols v. McKelvin*, 52 F.3d 1067 (5th Cir. 1995)(per curium).

In fact, Plaintiff herself, who is a former romantic partner of Decedent and who knew Powell very well, was shocked by the suicide, insofar as she had spoken to Powell just two (2) weeks prior to his death, and he was cheery and optimistic about his future:

> Q:      When did you meet Blake Powell?
> A:      I met him in 2011.
>
> …
>
> Q:      So if I understand you correctly you and Blake began a romantic relationship in 2014?
> A:      Correct, yes sir.  And it was on and off.  It was on and off until, we're in 2022, so it was off and on until 2020, I guess…
>
> …
>
> Q:      You said that you spoke to Blake on the phone for the final time two weeks before his death?
> A:      Yes.
>
> Q:      And that you all were, you both were laughing and joking?
> A:      Yeah.  Like it was not a bad conversation.
>
> Q:      And he was making plans to get together with [T.A.G.] after he got out?
> A:      Yes.  Like, he even asked if we could get back together on the phone…and I was like, no, you can't have me.  I've had a baby with somebody else, why would you want me?  And like Blake's personality, and he was like, well, I guess I'll just be out here f------ these hoes…

---

[8] *Id.*

…

Q:    Did he seem optimistic about his ability to clean up his life after prison?
A:    Yes…[h]ell yes, I thought he could do something with his life for sure.

…

Q:    During either of those two conversations with you, did Blake ever indicate
       to you that he was thinking about committing suicide?
A:    No.

Q:    Did Blake ever indicate to you that he was depressed?
A:    No.  I mean, okay, maybe the first conversation.

…

Q:     Were you surprised that Blake had killed himself?
A:     Yes, most definitely, most definitely.

Q:     Was it unexpected for you?
A:     Yes, very shocking.[9]

Considering the fact that Powell did not exhibit an overt risk of self-harm on the evening he died or clearly as far back as two weeks prior to his death, in conjunction with 1) the existence of what will be shown to be a constitutionally sound suicide prevention policy; and 2) the existence of a constitutionally sound suicide prevention training protocol for Ouachita Correctional Center ("OCC") deputies, there is no possible way either Sheriff Jay Russell or Pat Johnson could have been either deliberately indifferent to Decedent's needs, nor can they be held vicariously liable under Louisiana state law for Decedent's suicide.  Further, a review of Plaintiff's *First Amended Complaint* shows a myriad of allegations regarding actions which were allegedly not taken weeks (and in one case, almost a month) prior to Decedent's death.[10]   Defendants aver that these

---

[9] Given the number of references to Brittany Guillot's deposition testimony, her deposition is being attached hereto in its entirety as Exhibit I.
[10] See R. Doc. 29, ¶¶ 18(A) and 18(B).

allegations are completely irrelevant to this matter.  Decedent did not commit suicide on February 18, 2020, or March 3, 2020.  He killed himself on March 13, 2020 which is, for the purpose of this litigation, the only date that truly matters. As such, those allegations will not be discussed any further.

However, before even discussing the actual merits of the case, there are certain pleading deficiencies which must be addressed.  Finally, Defendants respectfully request that should this Court ultimately dismiss the federal claims in this matter, either on the merits or for procedural reasons, that it retain jurisdiction over Plaintiff's Louisiana state law claims, and issue as ruling as to those claims, as well.

## II.  LAW AND ANALYSIS

### A.  **Summary Judgment standard.**

Summary judgment is appropriate when the evidence before a court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)  "The moving party may meet its burden to demonstrate the

absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id*. The court need consider only the cited materials. FED. R. CIV. P. 56(c)(3). Rule 56 does not require a court to "sift through the record in search of evidence to support a party's opposition to summary judgment." *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoted source omitted).

There can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23. This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323. While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). To rebut a properly supported motion for summary judgment, the opposing party must show, with "*significant* probative evidence," that a genuine issue of material fact exists. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (emphasis added). "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson*, 477 U.S. at 248).

Here, Plaintiff has a very high evidentiary burden in attempting to impart liability for Powell's suicide upon Defendants. Simply stated, Plaintiff is unable to satisfy that burden for the reasons listed below.

**B.**     <u>**Defendants cannot be found liable in this matter under any federal claim.**</u>

As previously stated, before addressing the merits of this case, it is necessary to first address the pleading deficiencies which remain in this matter, despite Plaintiff having amended her *Complaint,* wherein she unsatisfactorily expandedupon her *Monell* claims.    Plaintiff's *Complaint* names Jay Russell, Sheriff of Ouachita Parish ("the Sheriff"), as a defendant in the instant lawsuit in his official capacity.   Up until recently it was unclear in what capacity Plaintiff had named Warden Pat Johnson as a party; however, Plaintiff specified in her previously filed *Memorandum in Opposition to Defendants' Judgment on the Pleadings* that her claims against Pat Johnson are also in an official capacity context.   As has been previously pled, this is not allowed.

"Official capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent." *Burge v. Parish of St. Tammany*, <u>187 F.3d 452, 466</u> (5th Cir. 1999).   According, an official capacity claim against the Sheriff or Pat Johnson would, in reality, be a claim against the local governmental entity itself. *Passerrello v. Sumner*, Civil Action No. 3:09-1916, <u>2013 WL 4590618</u> at *2 (W.D.La 8/28/13); citing *Glasper v. Guzman*, Civil Action No. 06-2040, <u>2009 WL 1507568</u> at *6 (E.D.La. 5/27/09).   The United States Fifth Circuit Court of Appeals has explained:

> "In order to hold a municipality or local government unit liable under Section 1983 for the misconduct of one of its employees, a plaintiff must initially allege that an official policy or custom was the cause in fact of the deprivation of rights inflicted.   To satisfy the cause in fact requirement, a plaintiff must allege the custom or policy served as a moving force behind the constitutional violation at issue, or that [her] injuries resulted from the execution of an official policy or custom.   The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts." *Spiller v. City of Tex. City Police Dept.*, <u>130 F.3d 162, 167</u> (5th Cir. 1997)(quotation marks, brackets and citations omitted).

Further, "[a] plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity." *Colle v. Brazos County, Tex*, 981 F.2d 237, 245 (5th Cir. 1993).  Rather, he must identify the policy or custom which allegedly caused the deprivation of her constitutional rights.  *See, e.g., Murray v. Town of Mansura*, 76 Fed.App'x 547, 449 (5th Cir. 2003), citing *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 483 n. 10 (5th Cir. 2000); *Treece v. Louisiana*, 74 Fed.App'x 315, 316 (5th Cir. 2003), citing *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed. 2d 611 (1978); *Bennett v. Pippin*, 74 F.3d 578, 584 (5th Cir. 1996).

An "official policy" may be either a "policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers *or* a persistent, widespread practice … which, although not authorized by an officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents a municipal policy.  *Webster v. City of Houston,* 735 F.2d 838, 842 (5th Cir. 1992);(*citing Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984)).  "Isolated acts" generally cannot establish the existence of a custom or practice. *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003).  A custom is tantamount official policy when it is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Webster*, F.2d 838 at 841.  Where prior incidents are used to prove a custom, they "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice…"  *Id.* at 842.  This standard requires similarity and specificity, as "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Estate of Davis ex rel McCully v. City of North Richland Hills*,

406 F.3d 375, 383 (5th Cir. 2005).  A custom also requires "sufficiently numerous prior incidents." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989).

Dismissal of a claim is proper where, within the framework of the complaint, plaintiff's grounds for entitlement to relief are mere labels, conclusions, and a formulaic recitation of the elements of a cause of action.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).  "[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief."  *Hughes v. Tabacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001).  "The [district] court may dismiss a claim when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999).

Plaintiff has failed to plead, twice over, the requirements for sufficiently asserting a policies, practices, or customs claim.  More specifically, Plaintiff has failed to identify the existence of an official unconstitutional policy as contemplated by *Webster, supra*. Indeed, Plaintiff seems to generally assert that the policies which were in place simply were not followed by his subordinates.  This does not give rise to a cause of action against Sheriff Jay Russell in his official capacity.  To the extent that actual policy allegations are made, they remain vague, conclusory and, therefore, deficient per law cited above.

To the extent Plaintiff has alleged the existence of a *de facto* policy for a failure to monitor suicidal inmates, she has failed to plead a showing of similar prior incidents which "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice…" *Webster* 735 F.2d at 842.  Isolated acts, such as the one detailed in this matter, generally cannot establish the existence of a custom or policy. *Carter v. Firth*, 2018 WL 1597742 at *6 (W.D.La.

April 2, 2018)(internal citations omitted).  For these reasons, Plaintiff's policies, practices, and customs claims against Sheriff Jay Russell must be dismissed due to their procedural deficiencies.

### C.   Pat Johnson cannot be sued in an official capacity context.

Plaintiff has, per her express representations, only sued Pat Johnson in his official capacity.[11]  It is well-settled that official capacity suits are only viable against persons responsible for formulating an official policy which results in a constitutional deprivation.  See *Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 361-62, 116 L.Ed.2d. 301 (1991); citing *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 3105, 876 L.Ed.2d 114 (1985); and *Monell,* 98 S.Ct. at 2018.  A "policymaker" is an official who has *final* policy making decision power and whether an official has final policymaking authority is a question of state law.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988).  Under Louisiana Law, the sheriff is the final policymaker for his office.  *Craig v. St. Martin Parish Sheriff*, 861 F.Supp. 1290, 1300 (W.D.La. 1994), citing La. Const. Art. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the parish.").  Therefore, only Sheriff Jay Russell may be sued in his official capacity in this matter.

However, any official capacity claims against Pat Johnson are improper for an additional reason.  In the matter of *Harris v. Brown*, 2021 WL 5822100 (W.D.La. November 22, 2021), this very Court held:

> "In the motion to dismiss, [Warden] Weatherly contends that he is not a final policymaker, and therefore, not a proper defendant for a Monell claim. A more basic issue, however, is that, according to the FSAC, Harris sued Weatherly in his official capacity as warden of the [Richland Parish Detention Center]. Moreover, an official-capacity suit is treated as a suit against the entity that the person

---

[11] See R. Doc. 30, *Memorandum in Opposition to Defendants' Motion for Partial Judgment on the Pleadings*, page 13. ("Defendants move for Motion for Judgment on the Pleadings as it pertains to any individual capacity claims against Sheriff Jay Russell and Warden Pat Johnson.  Plaintiff does not seek to bring any individual capacity claims against either Sheriff Jay Russell or Warden Pat Johnson, thus this argument is moot."

represents. However, this court consistently has held that the RPDC is not a juridical person capable of being sued. *Johnson v. Richland Par. Det. Ctr.,* Civ. Action No. 18-1091, 2019 WL 3026987, at *3 (W.D. La. June 19, 2019), R&R adopted, 2019 WL 3021827 (W.D. La. July 10, 2019); *Perez v. Richland Par. Det. Ctr.*, Civ. Action No. 19-1124, 2019 WL 6038031, at *4 (W.D. La. Oct. 24, 2019), R&R adopted, 2019 WL 6003241 (W.D. La. Nov. 13, 2019); *Jeansonne v. Richland Par. Det. Ctr.*, Civ. Action No. 07-0405, 2007 WL 1537616, at *3 (W.D. La. Apr. 11, 2007). Accordingly, Harris cannot bring an official capacity claim against Weatherly, which, in effect, seeks a judgment against the non-entity, RPDC. Instead, this court has recognized that the RPDC is a corrections facility operated by the Richland Parish Sheriff (internal citations omitted). As such, Sheriff Gilley, as final policymaker, is the only proper party against whom Harris may assert an official capacity claim for damages (internal citations omitted)."

Similarly, in the matter of *Williamson v. Garber*, 2020 WL 1244597 at *2-3 (W.D.La.

February 5, 2020), the court held:

"Defendants argue that Plaintiff's suit against Warden Smith in her official capacity as 'the co-policy maker for the Lafayette Parish Jail' must be dismissed because, under Louisiana law, only the Sheriff is responsible for policy making with respect to management of the parish jail. The Court agrees. State law guides the determination as to the official whose decisions represent the official policy of the local government unit. *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989). Under Louisiana law, the sheriff is a final policymaker with respect to management of the jail. See *Jones v. St. Tammany Parish Jail*, 4 F.Supp.2d 606, 613 (E.D. La.,1998) citing La. Const. Art. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the parish."); La.Rev.Stat. 33:1435 ("Each sheriff ... shall preserve the peace and apprehend public offenders."). "Sheriffs in Louisiana are final policy makers with respect to management of the jail. This duty includes the obligation to provide medical care for the prisoners." Jones, 4 F.Supp.2d at 613; see also *Oladipupo v. Austin*, 104 F.Supp.2d 654, 661 (W.D. La. 2000) (the sheriff is responsible for the administration of jail, including provision of medical care). As Warden Smith was not a final policy maker and is not alleged to be directly involved in any of the alleged violations, the Court will dismiss the official capacity claims against her…"

Therefore, a suit against Pat Johnson in his official capacity would actually be a suit against the Ouachita Correctional Center, which is not a legal entity capable of being sued. Given Pat Johnson's lack of status as a final policymaker under Louisiana law, in addition to the fact that a suit against Pat Johnson in his official capacity would result in an impermissible result, Defendants

submit that any and all official capacity claims lodged against Pat Johnson must be dismissed, with prejudice.

### D.     OCC's suicide prevention policy is not unconstitutional.

Defendants maintain Plaintiff has failed to properly plead her policies, practices, and customs claims and, as such, they should be dismissed on that basis alone.  However, the actual substance of Plaintiff's arguments are meritless, thereby providing another basis for dismissal.  Again, the burden Plaintiff bears is to show that the suicide prevention policy implemented was so deficient that it served as the moving force behind a purported constitutional violation. From a procedural and factual standpoint, Plaintiff has simply failed to meet his burden regarding the existence of an unconstitutional policy regarding suicide prevention of inmates at OCC.  However, the facts and evidence further show that OCC had an exceptionally crafted suicide prevention policy in place on the date of Decedent's death.[12]  A review of the policy shows that steps are taken from the moment of booking to ensure the safety of inmates, in addition to the steps which are to be taken if a correctional officer suspects an inmate may be contemplating suicide and the medical steps which are to be taken in the event an inmate is considered to be suicidal.

OCC clearly had a suicide prevention policy in place on the date of Powell's death, which Defendants submit was and remains constitutionally sufficient.  It is Plaintiff's burden to show that it is not.  More specifically, if the municipal policy is not unconstitutional on its face, then the plaintiff must establish that the policy or custom was adopted or maintained with objective deliberate indifference to the prisoner's constitutional rights. *Piotrowski v. City of Houston.*, 237 F.3d 567, 579 (5th Cir. 2001).  Deliberate indifference occurs when the policymakers promulgate or fail to promulgate a policy or custom, despite the known or obvious consequences that

---

[12] See Exhibit J-1.

constitutional violations will result.  *Id.*  As this Court is well-aware, a supervisory official cannot be liable merely for failing to adopt policies to prevent constitutional violations; however, he can be held liable if he affirmatively adopts policies which are wrong or illegal."  *Reimer v. Smith*, 663 F.2d 1316, 1323 (5th Cir. 1981).

The plaintiff must also establish that there is a direct causal link between the municipal policy and the officer's constitutional violation by showing that the policy was the moving force behind that violation.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Piotrowski*, 237 F.3d at 580.  To meet the moving force element, Plaintiff must demonstrate that the suicide prevention policy at issue was unconstitutional or was adopted with deliberate indifference to the *known and obvious fact* that such constitutional violations would result.  *See Webb v. Town of St. Joseph*, 925 F.3d 209, 219 (5th Cir. 2019).  Further, a municipal policy usually cannot be inferred from a single constitutional violation.  *Piotrowski*, 237 F.3d at 581.

In the instant case, Plaintiff has not identified any policy, practice or custom which served to violate Plaintiff's constitutional rights.  More specifically, Plaintiff has generically alleged knowledge of "serious deficiencies in the policies, practices and procedures at the jail related to the treatment, care and observation of prisoners who were being monitored for suicide prevention."[13]  Plaintiff was asked through written interrogatories to identify the "policies and procedures of Sheriff Jay Russell and/or the Ouachita Parish Sheriff's Office related to the treatment and monitoring of ***suicidal persons*** in custody are deficient, detailing, with specificity, how they are deficient.  Plaintiff was unable to do so, as evidenced by her response, below:[14]

---

[13] R. Doc. 1, ¶ 35.  Interestingly, Plaintiff also argues that Powell suffered harm for a "fail[ure] to properly apply the policies and procedures of the prison." ¶ 26.
[14] See Exhibit K.

**ANSWER TO INTERROGATORY NO. 4:**

Plaintiff objects to this Interrogatory No. 4 as it calls for a legal conclusion and/or expert opinion which Plaintiff is not qualified to give. Further, Plaintiff objects to this Interrogatory No. 4 as premature. Discovery is ongoing, Plaintiff's expert report is not yet due, and Defendants produced the relevant policies and procedures pertaining to the Ouachita Correctional Center yesterday, which Plaintiff and her expert have not yet had a chance to review.

To date, this Interrogatory has not been supplemented or amended.  Defendants submit that Plaintiff's response is the only valid response she could give under the circumstances.  OCC's Suicide Prevention Policy is clearly not unconstitutional, insofar as it provides detailed and thorough instructions as to: 1) identifying a suicidal inmate during the booking process; 2) identification of a potentially suicidal inmate during incarceration; and 3) the steps necessary to put an inmate on suicide watch and what to do thereafter to ensure protection of the inmate.[15]  The policy also provides that correctional deputies are to attend annual training in suicide prevention and intervention.[16]  Moreover, per the testimony of Warden Paul Campbell, the last suicide preceding Decedent's own was more than ten (10) years ago, having occurred on or about August 25, 2011.[17]  Considering these facts, Plaintiff will be unable to show that the Ouachita Parish Sheriff's Office's suicide prevention policy was adopted with "deliberate indifference" to the needs of OCC inmates, or that the suicide prevention policy was the moving force behind Decedent's death.

---

[15] Exhibit J-1.
[16] *Id*.
[17] See Exhibit J, Affidavit of Paul Campbell, ¶ 13.

**E.     Defendants were not deliberately indifferent to Blake Powell's needs under a theory of supervisory liability or any other theory.**

In her *Memorandum in Opposition to Defendants' Motion for Partial Judgment on the Pleadings*, Plaintiff acknowledged she was not bringing any individual capacity claims in this matter against either Sheriff Jay Russell or Pat Johnson. Absent any individual capacity claims, there can be no claim for supervisory liability. However, out of an abundance of caution, Defendants will address Plaintiff's supervisory liability claims. Should this be determined as unnecessary by this Honorable Court, Defendants respectfully request this argument be declared moot.

Decedent was a convicted inmate housed in OCC at the time of his death and, therefore, the Eighth Amendment controls this action. In an Eighth Amendment act or omission case, " [f]or the individual defendant, the plaintiff 'must establish that the official(s) acted with subjective deliberate indifference to prove a violation of [his] constitutional rights." *Olabisionotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999), citing *Flores v. County of Hardeman*, 124 F.3d 736, 738-39 (5th Cir. 1997) (emphasis added). Subjective deliberate indifference means 'the official had subjective knowledge of a substantial risk of serious harm but responded with deliberate indifference to that risk. *Id.* at 526, citing *Hare*, 74 F.3d at 650. With regards to an individual, "liability attaches only if [the individual] actually knew - not merely should have known - about the risk." *Olabisiomotosho*, at 528, citing *Farmer v. Brennan*, 511 U.S. 825, 838, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)(emphasis added). ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").

"It is well settled that 'negligent inaction by a jail officer does not violate the due process rights of a person lawfully held in custody of the State." *Sibley v. Lemaire*, 184 F.3d 481, 489 (5th

Cir. 1999). In *Sibley*, an inmate incarcerated at the Vermillion Parish Detention Center underwent a psychotic episode and was placed in an isolation cell. *Id.* at 484. There was no closed-circuit camera in the cell and the inmate could only be observed through a slot in the cell's door. *Id.* Over the period of approximately five (5) days, the inmate began exhibiting increasingly erratic behavior, including: 1) holding a Bible upside down while appearing to read from it; 2) staring into his toilet; 3) urinated on his mattress; 4) threw food around his cell; 5) threw his Bible and family photos in the toilet; and 6) refused to take a shower because he was afraid the Devil would come up through the drain. *Id.* At one point a deputy checked on the inmate to find him chanting and, shortly thereafter, plucking his eyeballs out of his head with his fingers. *Id.* at 484-85. As a result, the inmate brough a claim under Section 1983 claim for allegedly failing to provide mentally ill inmates with reasonable medical care. *Id.* at 487.

Before the Court ruled on the *Monell* claim, it tasked itself with determining if the Correctional Center's employees acted with deliberate indifference to the inmate given his increasingly erratic *and known* behavior. The Court answered in the negative, and Court found that on the occasion in question, "nothing [the plaintiff] did so clearly indicated an intent to harm himself that the deputies caring for him could have only concluded that he posed a serious risk of harm to himself." *Sibley*, 184 F.3d at 489. Further, the Court determined that in order to be deliberately indifferent, the Defendants would have had to have chosen their course of action or inaction "with the expectation that some harm would result to [the Plaintiff]," and without such a finding, found dismissal appropriate. *Id*. at 490 n.7.

Indeed, the United States Supreme Court has held...

> "...a prison official cannot be found liable under the Eighth
> Amendment for denying an inmate humane conditions of
> confinement unless the official knows of and disregards an
> excessive risk to inmate health or safety; the official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015); citing *Farmer,* 511 U.S. at 837 (emphasis originally found in *Farmer*).

As both this Court and the Fifth Circuit have repeatedly noted, "deliberate indifference is an extremely high standard to meet." *Taylor v. Bayou Corr. Center,* 2021 WL 6118739 at *9 (W.D.La. December 7, 2021); *Domino v. Texas Dept. Of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "[T]he plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Frazier v. Keith*, 707 F.App'x 823, 824 (5th Cir. 2018).

Accordingly, to prove deliberate indifference, Plaintiff is required to demonstrate that Defendants both knew of and disregarded an excessive risk that Decedent would commit suicide. *See Domino*, 239 F.3d at 755. "And, the 'failure to alleviate a significant risk that [the official] should have perceived, but did not is insufficient to show deliberate indifference." *Id.* citing, *Farmer*, 511 U.S. at.  Plaintiff has not alleged that either Sheriff Jay Russell or Pat Johnson participated in or actively caused Decedent's death.  As such, they can only be found liable in their capacities as supervisors, and that is only if this Court does not abide by Plaintiff's express language disavowing any and all individual capacity claims in this matter.

"Section 1983 offers no respondeat superior liability," nor are supervisory officials "liable for the acts of subordinates on any theory of vicarious liability." *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002).  Where supervisory liability is raised against a party for an inferior

18

officer's violation of an individual's constitutional rights, the party is liable under § 1983 if: 1) there was a failure to train or supervise the officers involved; 2) there is a causal connection between the failure to train or supervise and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise amounted to deliberate indifference to the plaintiff's constitutional rights.[18]  Also, mere proof that the injury would not have occurred if the officer had received better or additional training cannot, without more, support liability.  *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)(internal citations omitted).

Further, a prison official can be held liable in his supervisory capacity "even without overt personal participation in the offensive act if [he] implement[s] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation. *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987).  However, the policy at issue is not deficient. There is no evidence that Sheriff Jay Russell, Pat Johnson, or any other OPSO employee knew Decedent posed a risk of suicide on the day he died.  There is no causal link between the suicide policy that was in place on the date of Decedent's death and, therefore, no constitutional violation exists.   Further, the suicide prevention training protocol which was in place at the time of Decedent's death met, if not exceeded, constitutional requirements.

### F.     Plaintiff does not have a valid claim for a failure to train or supervise.

Similarly, Plaintiff cannot support her claim that Defendants failed to adequately train or supervise correctional officers working at OCC.  Procedural deficiencies aside, Plaintiff's claim is meritless.  Employees of the Ouachita Parish Sheriff's office are required to attend numerous annual trainings, one of which is a suicide prevention class.[19]  The training materials utilized in

---

[18] Defendants must note Plaintiff has not expressly named any correctional officers or deputies as parties in this matter.
[19] Exhibit J and Exhibit J-1, ¶ H.

that class thoroughly cover a variety of topics including, but not limited to: 1) identifying individuals who are a potential risk of committing suicide; 2) steps a deputy should take after identifying a potential suicide risk; 3) "Key Times for Observation," which outline scenarios in which inmates might be at a heightened risk of suicidal ideation; and 4) best practices for caring for an inmate who is at risk of suicide.[20]

Further, all but one deputy who was staffing B-Dorm, which is where Decedent was assigned on the night he died, had attended the most recent suicide prevention training class, which utilized the aforementioned materials.[21]   The only deputy who had not attended the suicide prevention training class was Deputy Roy Mclendon, and that was only because he was hired after the class was held and prior to the start of the 2020 suicide prevention training class.[22]   However, Deputy Mclendon was being "shadowed" by Deputy Brian Milstead as his "Field Training Officer" on March 13 and March 14, 2020. Deputy Milstead had successfully completed the Ouachita Parish Sheriff's Office's annual suicide prevention training in 2019 and was POST certified on the date of Decedent's death.[23]

"[T]he failure to provide proper training may fairly be said to represent a policy for with the [Defendants are] responsible, and for which [they] may be held liable if it actually causes injury." *City of Canton*, 489 U.S. at 390.   An official's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.  *See Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 179 L.Ed.2d 415 (2011). A municipality's failure to train its employees must amount to "deliberate indifference to the rights of a person with whom the [untrained employees] come into contact. *City of Canton,* 489 U.S. at 388.  Only then "can such a shortcoming be properly

---

[20] See Exhibit J-2, OPSO's Suicide Prevention Training materials.
[21] Exhibit J-3, 2019 OPSO Suicide Prevention Training sign-in sheets.
[22] See Exhibits E and J, ¶¶ 7 & 8, respectively.
[23] See Exhibit F, ¶ 8.

thought of as a city 'policy or custom' that is actionable under Section 1983.  *Id.* at 389; *Connick*, 563 U.S. at 61.  In order for liability to attach due to a claim for failure to train, the plaintiff "must allege with specificity how a particular training program is defective." *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009).

Deliberate indifference for purposes of a failure to train claim ordinarily requires plaintiffs to prove a pattern of similar constitutional violations by untrained employees.  Without notice that a course of training is defective in a particular respect, decision makers cannot be said to have deliberately chose a training program that will cause violations of constitutional rights.  *Connick*, 563 U.S. at 62.  The official may be liable for failure to supervise or train if: 1) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; 2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and 3) the failure to train or supervise amounts to deliberate indifference.  *Sims v. Adams*, 537 F.2d 829, 911-12 (5th Cir. 1976).  For an official to act with deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Within the context of prison suicides, specifically, it is well-established that the duty to keep inmates safe includes a responsibility on the part of prison officials "to provide adequate protection against a prisoner's known suicidal impulses."  *Anderson v. Dallas Cty. Tex.,* 286 F.App'x 850, 857 (5th Cir.2008)(per curium) (citing *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 107 (5th Cir. 1993)).  The Fifth Circuit has also held that a municipality should train its officers to recognize and not ignore "obvious medical needs of detainees with known, demonstrable, and serious mental disorders," but is not required to train its officers to screen each detainee "so that

the officers will unerringly detect suicidal tendencies." *Burns v. City of Galveston, Tex.,* 905 F.2d 100, 104 (5th Cir. 1990).

Further, "the failure to train custodial officials in screening procedures to detect *latent* suicidal tendencies does not rise to the level of a constitutional violation." *Evans*, 986 F.2d at 107-08 (emphasis in original). "In the absence of manifest signs of suicidal tendencies, a city may not be held liable for a detainee's suicide in a § 1983 suit based on a failure to train." *Whitt v. Stephens Cty.*, 529 F.3d 278, 284 (5th Cir. 2008). A prison official will not be held liable if he merely "should have known" of a risk; instead, to satisfy this high standard, a prison official must be shown to have acted with deliberate indifference to the risk. *Farmer,* 511 U.S. at 837.

First and foremost, Defendants submit Plaintiff has failed to properly plead her claims for an alleged failure to train or supervise and, for that reason alone, this claim should be dismissed. Plaintiff has made the conclusory allegation that the Sheriff and Pat Johnson failed to properly train or supervise employees of the Ouachita Parish Sheriff's Office, without identifying how the training programs in place are deficient. Plaintiff has not alleged facts to show that Defendants acted with deliberate indifference in their training of Ouachita Parish Sheriff's Office employees in any respect whatsoever. Plaintiff has failed to allege specific facts to establish a pre-existing pattern of bad acts similar to the ones alleged in this case. Plaintiff has not alleged, with specificity, a pattern of pre-existing violations to put Defendants on notice for the need of additional training. Much like her claims regarding policies, practices, and customs, Plaintiff has merely alleged a failure to train or supervise in the absence of any facts whatsoever to support her claim. Due to these deficiencies, Defendants must harken back to *Stuart, supra.,* once again. There, this Court noticed, "[a]s with [the plaintiff's] claims regarding policies, practices, or customs, Plaintiff has merely alleged a failure to train without alleging any facts to support her claim. Therefore, her

22

'failure to train claim' must also be dismissed" due to its fundamental pleading deficiencies. *Id.* at *3.  The same holds true here.

However, pleading deficiencies aside, Plaintiff's failure to train or supervise claim should be dismissed on the merits, as well.  Much like the Ouachita Parish Sheriff's Office's suicide prevention policy, its training protocol cannot be said to represent deliberate indifference to the needs of OCC inmates, including those of Decedent.  All OCC staffers are required to attend a highly detailed suicide prevention training annually.  Further, Plaintiff has not provided a nexus between an alleged lack of training with the harm that occurred in regard to Powell's isolated incident.  She has merely alleged the incident happened.

Perhaps most importantly, there is no evidence the Decedent exhibited overt, as opposed to latent, suicidal ideations on March 13 or March 14, 2020.  In this case, the undisputed evidence shows that Decedent did not exhibit *any* suicidal tendencies on the night he died. The training materials which are utilized cannot be said to have been the "moving force" behind Decedent's injuries and, moreover, Plaintiff has not provided any evidence to show a pattern of similar incidents which would have put Defendants on notice of the risk of suicide in the cell where Decedent was assigned.  For all of these reasons, Plaintiff's failure to train or supervise claims should be dismissed.

### G.   Prison officials were not aware Decedent posed a suicide risk.

First and foremost, it must again be pointed out that Plaintiff has not alleged either Sheriff Jay Russell or Pat Johnson knew Decedent posed a risk of suicide on March 13, 2020.  Indeed, Warden Pat Johnson testified he did not know Blake Powell was an inmate in OCC until after his death.[24]   Further, no correctional officer working on Decedent's cell block on the night he died

---

[24] See Exhibit L, Deposition of Pat Johnson, pages  57-58.

23

had any indication or notice of overt or latent suicidal ideations on the part of Decedent.  These facts, in and of themselves, serve to free Defendants of any supervisor liability in this matter.  However, it appears Plaintiff is alleging that because Decedent had a prior history of suicidal ideations, this fact alone serves to impart liability upon Defendants for Decedent's suicide.  This is a false premise, as evidenced by the law below.

In *Flores v. County of Hardeman*, <u>124 F.3d 736</u> (5th Cir. 1997), an inmate who had not exhibited any blatant suicidal tendencies during his incarceration was found hanging from a shower rod in his cell. *Id.* at 737.  The family of the inmate sued, among others, the Sheriff of the prison, alleging that he was deliberately indifferent towards the inmate's suicidality.  The Sheriff in the matter, who had known the inmate all his life, gave orders to put the inmate under heightened observation for a period of twelve (12) hours, because he "felt that [the inmate] was not acting like himself."  *Id.* at 737 & 738.  After twelve hours, the inmate appeared to be doing better.  At no time did he  express any "overt signs that he intended to commit suicide."  *Id.* at 737. He was given back several items, including a blanket, and was only checked hourly.  *Id.*  Shortly after 12:30 a.m. a custodial officer observed the inmate walking around his cell.  *Id.*  At 12:45 a.m. the officer could no longer see him but heard noises via the sound monitor.  *Id.*  At 1:20 a.m., the officer called out for the inmate, but got no response.  *Id.*  Upon entering the cell, the inmate was found hanging from a shower rod attached to a piece of the blanket he had been given.  *Id*.  The primary question the court considered was whether, under the episodic act or omission standard, any defendant had actual knowledge of a substantial risk of suicide, but responded with deliberate indifference.  *Id.* The Fifth Circuit found that no defendant's conduct, including the Sheriff's, rose to the level of deliberate indifference considering both the facts and the law.  Noting that while the sheriff's

actions may have been "ill-advised," the court reasoned that the inmate's failure to indicate any suicidality relieved the Sheriff of any liability.  *Id.* at 739.

Here, there is much greater lapse of time than twelve hours since the last time Decedent was placed on suicide watch for having expressed ideations of self-harm.  More specifically, Decedent hung himself almost two months after the last time he was placed on formal suicide watch, and almost one month since he was placed under heightened observation, and only then out of an abundance of caution.  Decedent gave no indication he presented any risk of self-harm, as evidenced by the testimony of the correctional officers working in B-Dorm the night Powell died and the testimony of Plaintiff, herself.

Similarly, in the matter of *Smith v. Blue*, 35 Fed.App'x 390 (5th Cir. 2002); 2002 WL 760136, the parents of a juvenile who was in the custody of a boot camp for juvenile offenders brought suit after their son committed suicide during his detention on September 2, 1997.  More specifically, the parents sued the county and Byron Blue ("Blue"), a shift supervisor at the boot camp.  *Id.* at *1.  Blue filed a Motion for Summary Judgment in which he argued a finding of qualified immunity was appropriate, which the district court granted.  *Id.*  The juvenile's parents appealed that ruling.  In reviewing the case, the Fifth Circuit affirmed the district court's ruling. The court ruled that even though the juvenile had apparently attempted to commit suicide just nine (9) days earlier, and that Blue was aware of that prior attempt, "the district court correctly found that [fact] to be insufficient to create a dispute as to whether on the evening of [the juvenile's] suicide almost one week later, Blue subjectively believed there was a significant risk [the juvenile] would take his own life."  *Id.*  On the evening the juvenile committed suicide he, like Decedent herein, was not on suicide watch.  *Id.*  Also, like Decedent herein, the juvenile had been placed in "temporary confinement" due to a disciplinary infraction.  *Id.*  The court noted that Blue had no

psychological training to access a suicide risk and that the juvenile did not do or say anything which would have made the risk of suicide obvious to Blue. *Id*.

The similarities between *Blue* and the instant matter are striking. However, it is important to point out that the Fifth Circuit did not find that a nine-day gap between a prior suicide attempt and a successful suicide was sufficient for the purpose of proving the defendant "should have known" the juvenile was a suicide risk. Even if one assumes that decedent was a suicide risk on February 18, 2020 (which Defendants deny), that would create a twenty-four (24) day gap between Decedent's last overt indication of suicidality and the day he actually succeeded in killing himself. If a nine-day gap is insufficient for the purpose of proving subjective notice, almost thrice as many days is, as well. Absent a lack of notice, Defendants simply cannot be found liable in this matter.

## H.    Defendants are entitled to qualified immunity.

In the event this Court finds that either Sheriff Jay Russell or Pat Johnson can be held liable pursuant to a theory of supervisory liability despite Plaintiff's having forsaken any individual capacity claims, Defendants submit they are entitled to a finding of qualified immunity. As shown above, Defendants cannot be said with any degree of reliability to have violated Powell's constitutional rights as they pertain to his act of suicide and, as such, a finding of qualified immunity is appropriate.

A state official can be sued in his individual capacity and held personally liable under § 1983 if a plaintiff can show the official, acting under state law, caused the deprivation of a federal right. *Hafer v Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 361-62, 116 L.Ed.2d 301 (1991). Per the United States Fifth Circuit Court of Appeals, "This standard requires more than conclusional assertions. The Plaintiff must allege specific acts giving rise to a constitutional violation." *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002). As a defense to § 1983 claims, government officials

may invoke qualified immunity, which shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Club Retro, LLC v. Hilton*, 568 F.3d 181, 184 (5th Cir. 2009).

The Supreme Court emphasized that qualified immunity functions as immunity from suit, rather than a mere defense to liability. *Pearson v. Callahan*, 555 U.S. 223, 237, 129 S.Ct. 808, 818, 172 L.Ed.2d. 565 (2009). "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Arledge v. Sherrill*, 32,189 (La. App. 2 Cir. 8/18/99); 738 So.2d 1215, 1220, citing *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S.Ct. 1092, 1097-98, 89 L.Ed.2d 271 (1986); *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000). "This means that even law enforcement officials who reasonably but mistakenly commit a constitutional violation are entitled to immunity." *Bazan v. Hidalgo County*, 246 F.3d 481, 488 (5th Cir. 2001) (quoting *Glenn v. City of Tyler*, 242 F.3d. 307, 312 (5th Cir. 2001).

Once the government official asserts qualified immunity, the burden shifts to the plaintiff to negate the defense. *Collier v. Montgomery*, 569 F.3d. 214, 217 (5th Cir. 2009). To overcome a claim of qualified immunity, a plaintiff must demonstrate: 1) that the official violated a statutory or constitutional right; and 2) that the right was "clearly established" at the time of the challenged conduct. *Cleveland v. Bell*, 938 F.3d 672, 675-76 (5th Cir. 2019). Courts retain flexibility as to which step of the two-step process they may consider first. *Pearson,* 555 U.S. at 236. It has been found prudent that when resolving cases in which the defense of qualified immunity to "determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

Per the Fifth Circuit, a constitutional right is "clearly established" when the contours of the right are "sufficiently clear that *every* reasonable official would understand that what he is doing violates that right." *Mullenix v. Luna*, <u>577 U.S. 7, 11</u>, <u>136 S.Ct. 305</u>, <u>193 L.Ed.2d 255</u> (2015) (per curiam) (internal quotation marks and citation omitted)(emphasis added). A defendant's actions "are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then know that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Thompson v. Upshur County, Tx,* <u>245 F.3d 447, 457</u> (5th Cir. 2001)(citing *Anderson v. Creighton,* <u>483 U.S. 635</u>, <u>107 S.Ct. 3034</u>, <u>97 L.Ed.2d 523</u> (1987); *Malley, supra.*; *Pierce v. Smith*, <u>117 F.3d 866, 871</u> (5th Cir. 1997)(emphasis in original).

Courts are cautioned not to "define clearly established law at a high degree of generality," but should instead conduct its analysis within the "specific context of the case." *Id.* at 12. "Unless existing precedent 'squarely governs' the conduct at issue, an official will be entitled to qualified immunity." *Cope v. Cogdill*, <u>3 F.4th 198, 204</u> (5th Cir. 2021); citing *Brosseau v. Haugen*, <u>543 U.S. 194, 201</u>, <u>125 S.Ct. 596</u>, <u>160 L.Ed.2d 583</u> (2004) (per curiam); *Mullenix*, <u>577 U.S. at 12</u>, <u>136 S.Ct. 305</u> (emphasizing that "[t]he dispositive question is whether the violative nature of particular conduct is clearly established" (internal quotation marks and citation omitted)).

In order for Plaintiff herein to overcome Defendants' invocation of qualified immunity, they are required to identify and present a case where a law enforcement official acting under similar circumstances was held to have committed a Constitutional violation and explain why that individual official's conduct was clearly proscribed. *Cope*, <u>3 F.4th at 205</u>; citing *Joseph ex rel. Estate of Joseph v. Bartlett*, <u>981 F.3d 319, 345</u> (5th Cir. 2020) (concluding the defendants were entitled to qualified immunity because the plaintiffs failed to identify an analogous case).

Although Plaintiffs are not required to identify an exact case on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, ⸺ U.S. – ⸺, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (quoting *White v. Pauly*, ⸺ U.S. ⸺, 137 S. Ct. 548, 551, 196 L.Ed.2d 463 (2017)).

As established above, neither Sheriff Russell nor Warden Pat Johnson acted with deliberate indifference to the needs of Blake Powell, under either a theory of supervisor liability or in their individual capacities.  First and foremost, Plaintiff has presented no evidence that either Sheriff Jay Russell nor Pat Johnson were put on notice that the Ouachita Parish Sheriff's Officer's training procedures vis-à-vis suicide prevention were deficient.[25]  Further, qualified immunity (and a granting of summary judgment) is appropriate because Defendants "cannot be held liable for constitutional violations committed by their subordinates because…Plaintiff[] has not established that any constitutional violations were committed by their subordinates.  *See Estate of Pollard v. Hood County, Tex.*, 579 Fed.Appx. 260, 266 (5th Cir. 2014); citing *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Texas Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir.2008)) ("In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates.' ") (emphasis added); *Doe v. Taylor ISD*, 15 F.3d 443, 454 (5th Cir.1994) (en banc) (supervisor's deliberate indifference to subordinate's wrongdoing must have "caused a constitutional injury to the" plaintiff).  Absent a showing that the training by Defendants was inadequate, or that Defendants acted with deliberate indifference to their subordinates' violations of Blake Powell's constitutional rights (which Defendants deny occurred), both a finding of

---

[25] Defendants maintain that the suicide prevention training referenced was not deficient.

qualified immunity and a granting of summary judgment are both appropriate and necessary in this matter. *Estate of Pollard,* 579 Fed.Appx at 266-67.

## I.    **Plaintiff's Louisiana state law claims must also fail.**

While simultaneously pleading Defendants were deliberately indifferent to Decedent's medical needs (thereby alleging some level of intent), Plaintiff has also pled negligence and vicariously liability causes of action under Louisiana law.  Powell had given no indication to any OCC employee he intended to harm himself prior to his death and, as such, there was no cause to place him on suicide watch.  Despite this fact, Plaintiff has asserted a Louisiana state law claim of vicarious liability for unnamed employees of Sheriff Jay Russell due to an alleged failure to properly protect Powell against a threat of self-harm, which Defendants deny.

Plaintiffs allege that certain John Doe defendants were negligent in a manner for which Louisiana law provides a remedy. In response, Defendants argue that Plaintiffs have failed to state a claim against Defendants and, therefore, Defendants are entitled to summary judgment in their favor.  Neither the Defendants nor any of their employees can be found to have acted negligently under Louisiana law, and therefore Defendants cannot be held liable for the death of Powell.

The analysis used to determine whether to impose liability under LSA-C.C. art. 2315 is the duty/risk analysis, which consists of the following four-prong inquiry:

1.    Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?

2.    Did the defendant(s) owe a duty to the plaintiff?

3.    Was the duty breached?

4.    Was the risk, and harm caused, within the scope of protection afforded by the duty breached?

*See Mart v. Hill*, 505 So.2d 1120 (La.1987); *Hill v. Lundin & Associates*, 260 La. 542, 256 So.2d 620 (1972).   In *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94), 646 So.2d 318, the Supreme Court discussed the duty/ risk analysis as follows:

> "Under a duty/risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover.  As such, in order for liability to attach under a duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element)." (Citations omitted.)

There is no "rule" for determining the scope of the duty owed. It is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. *Roberts v. Benoit*, 605 So.2d 1032 (La.1991). In determining the limitation to be placed on liability for a defendant's substandard conduct, the proper inquiry is how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. Although ease of association encompasses the idea of foreseeability, it is not based on foreseeability alone. Absent an ease of association between the duty breached and the damages sustained, there is no legal fault. *Roberts,* 605 So.2d at 1044-45.

Plaintiffs argue that Defendants had a general duty to protect Powell from suicide.  Indeed, in *Scott v. State,* 618 So.2d 1053 (La.App. 1 Cir.1993), *writ denied*, 620 So.2d 881 (La.1993), the Louisiana First Circuit Court of Appeal stated that "prison authorities owe a duty to use reasonable care to protect inmates from harm and that this duty extends to protecting inmates from self-inflicted injury. This duty is not absolute but depends upon the circumstances of the particular case."  The facts of this case show that Defendants' actions were both reasonable and there is not a requisite ease of association between Decedent's suicide and any action or inaction on the part of Defendants.

In *Misenheimer v. West Baton Rouge Parish Sheriff's Office*, 95-CA-2427; (La. App. 1 Cir. 6/28/96); 677 So.2d 159, the Louisiana First Circuit considered a case wherein an inmate trustee at the East Baton Rouge Parish Detention Center gained access to a deputy's handgun while working unsupervised in the motor pool. The inmate then used the handgun to commit suicide. The First Circuit found that, because no one at the facility had any knowledge or information making them aware of that inmate's suicidal tendencies, his use of the handgun to commit suicide "was neither foreseeable nor easily associated with any duty that was allegedly breached. Therefore, it was not encompassed in the duty owed to [the plaintiffs] by the defendants." *Id* at 161-162. The Court went on to state "[a] negative answer to any of the inquiries of the duty/risk analysis results in a determination of no liability . . . there can be no finding of liability in this case and we need not consider the remaining questions in the duty/risk analysis." *Id*.

Similarly, in the matter of *Leonard v. Torres*, 2016-1484; (La. App. 1 Cir. 9/26/17); ---So.3d---, 2017 WL 4301898, a pretrial detainee was found dead in his holding cell by prison officials after the detainee hung himself with his shoelaces. *Id.* at 1. The detainee's wife filed a lawsuit against both the Sheriff of Pointe Coupee Parish and the Warden of the Pointe Coupee Detention Center for, in essence, failing to prevent the detainee's suicide and for an alleged failure to properly train, supervise, and hire correctional center employees. *Id.* In response, the Defendants filed a Motion for Summary Judgment asserting that the detainee never expressed any suicidal thoughts or ideations to any employee of the sheriff's office, and no employees had notice or should have known that the detainee was at risk of suicide when he committed the act. *Id.* The district court denied the defendants' Motion for Summary Judgment and, after some procedural gymnastics, the district court's ruling was presented to the appellate court for review. *Id*.

Upon both review of the facts and prior precedent, the appellate court reversed the lower

court's denial of the defendants' Motion for Summary Judgment, stating, "While prison officials must exercise reasonable care to protect inmates from harm, including harm from suicide or other self-inflicted injury, the cases clearly provide that, in order to show that a duty arose on the part of the prison officials, the evidence must establish that the prison authorities either knew or should have known of an inmate's suicidal tendencies. Prison officials owe prisoners a duty to prevent self-inflicted harm that is reasonably foreseeable." *Id*. at 7.

In the instant matter, it is undisputed that the Defendants, both named or unnamed, had no indication that Powell was potentially suicidal on the date he killed himself.  Although Plaintiff had expressed suicidal ideations in the past (for which employees of OCC took appropriate action), Defendants submit this does not create the "ease of association" necessary for either finding negligence occurred or imparting vicarious liability upon the Sheriff.  Absent that knowledge, as the Court in *Misenheimer, supra*, articulated, the risk of self-harm is neither foreseeable nor easily associated with any duty that was allegedly breached as argued by Plaintiff herein.  Therefore, the risk that Powell might harm himself was not encompassed in the duty owed to him by Defendants herein.

### III.  CONCLUSION

As shown above, it is uncontroverted that none of the deputies who were assigned to Powell's cell block or who engaged with Powell on the night he died had any reason to believe he posed a threat to himself.  As such, there was no reason to place Powell on suicide watch or for any person who encountered Powell to believe he was suicidal.  This is the controlling fact in this case.

With respect to Plaintiff's official capacity claim against Sheriff Russell vis-à-vis his policymaking authority, that claim must also fail.  First and foremost, Plaintiff has not identified

any policy, practice or custom which served to violate Plaintiff's constitutional rights, as required by law.  However, even if Plaintiff had met her pleading requirement, it is clear that the OPSO policy regarding suicide prevention which was in place on the day Powell died was not deliberately indifferent to the needs of any OPSO inmate, much less Powell.

Plaintiff has similarly failed to sufficiently make a claim for any alleged failure to train or supervise insofar as she has neglected to state, with particularity, *how* OPSO's training protocol for suicide prevention is deficient.  Moreover, Plaintiff cannot show that the prison's training protocol for suicide prevention is deliberately indifferent to the needs of inmates.  As previously shown, OPSO's training program regarding suicide prevention is incredibly detailed and thorough, such that it can and should survive constitutional scrutiny by this Court.  Additionally, neither Sheriff Jay Russell nor Pat Johnson are alleged to have had any personal involvement in the acts giving rise to Decedent's death and, as such, any individual capacity claims against them should also be dismissed, should this Court determine they still exist despite Plaintiff's disavowal of all individual capacity claims.  Given that it is uncontroverted that neither the Defendants nor any deputy assigned to Powell's dorm on March 13, 2020 knew or had suspicion to believe he might commit suicide, Defendants cannot be said to have been deliberately indifferent to Blake Powell's needs in a supervisory capacity.  Considering these facts, Defendants submit that they are entitled to a finding of qualified immunity in this action. Further, because no named or unnamed Defendant knew or should have known that Decedent presented a risk of suicide on March 13 or March 14, 2020, Plaintiff's Louisiana State Law claims for negligence and vicarious liability should be dismissed, with prejudice, in accordance with the law.

Respectfully submitted,

FROSCH, RODRIGUE, ARCURI LLC

 s/ Jason P. Wixom
BLAKE J. ARCURI (LSBN #32322)
LAURA C. RODRIGUE (LSBN #30428)
JASON P. WIXOM (LSBN #32273)
1615 Poydras Street, Suite 1250
New Orleans, Louisiana 70112
Tel:  (504) 592-4600 Fax: (504) 592-4641
COUNSEL FOR DEFENDANTS
Email: barcuri@fralawfirm.com
        lrodrigue@fralawfirm.com
        jwixom@fralawfirm.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of February, 2022, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent by operation of the court's electronic filing system.  I also certify that a copy of the foregoing will be sent to all non-CM/ECF participant(s) by United States Mail, properly addressed and postage pre-paid.

     s/ Jason P. Wixom