UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **BRITTANY GUILLOT** | **CASE NO. 3:20-CV-01537** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **JAY RUSSELL ET AL** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment [Doc. No. 41] filed by Defendants Sheriff Jay Russell ("Russell") and Warden Pat Johnson ("Johnson"). An Opposition [Doc. No. 48] was filed by Plaintiff Brittany Guillot, ("Guillot") on behalf of her minor child T.A.G., on March 30, 2022. A Reply [Doc. No. 51] was filed by Russell and Johnson on April 4, 2022.

For the reasons set forth herein, the Motion for Summary Judgment is GRANTED.

**I.    BACKGROUND AND PROCEDURAL HISTORY**

Blake Powell ("Powell") is alleged to be the father of the minor child T.A.G. T.A.G.'s mother is Guillot, who is bringing this lawsuit on behalf of T.A.G. Powell was charged with unauthorized entry of an inhabited dwelling and possession of a controlled dangerous substance. On February 19, 2020, Powell pled guilty and received a sentence of two years at hard labor. Powell was incarcerated at the Ouachita Correctional Center ("OCC") from November 9, 2019, until his death on March 13, 2020. Powell committed suicide by hanging himself on the evening of March 13, 2020. The primary issue in this case is whether Defendants are legally responsible.

During the time of Powell's incarceration at OCC, he was placed on suicide watch twice. When Powell was arrested on November 9, 2019, he made a statement to the booking deputy, Corporal Irving, that he asked the victim of his burglaries to "kill him;" consequently, Powell

was placed on suicide watch in cell B-36.[1] On January 23, 2020, Powell contacted Deputy Heron through the speaker box in the cell claiming that he was suicidal. The deputy went to the isolation cell where Powell was being held, moved Powell to cell B-1, and started a suicide log.[2]

Additionally, on February 18, 2020, OCC placed Powell under heightened supervision. The deputy noticed Powell was acting distant, had a blank stare, and had abrasions on his wrist. Powell was taken to medical where he was seen by Deputy George and placed in cell B-38 for observation until Powell was on the list to see Dr. David Boyle ("Dr. Boyle"), a mental health professional. Powell told the deputies he needed help. Powell was not placed on suicide watch on February 18, 2020.

On March 3, 2020, Powell made a complaint to OCC that he thought he had been raped but stated that he "did not know for sure." Powell said, "I think they raped me."[3] OCC's nurse, Sgt. Bryan George recommended Powell see Dr. Boyle after the February 18 and March 3, 2020, visits.[4] The rape allegations were found by OCC to be false after watching video footage of the cell.[5]

According to Defendants, the only employees who were assigned to B-Dorm (where Powell was located) on March 13, 2020, were Deputy Webb Crecink, Lieutenant Richie Varino, Corporal Daryl Wells, Deputy Roy McLendon, Deputy Brian Milstead, Corporal Vance Whitton, and Deputy Ethan Bonner. Affidavits of these employees are attached to Defendants' motion for summary judgment.[6] According to those affidavits, none of the deputies had any knowledge that

---

[1] [Doc. No. 41-3, pp. 3-4].
[2] [Doc. No. 41-3, pp. 5-6].
[3] [Doc. No. 48-2 p. 24].
[4] [Doc. No. 48-2 pp. 20 and 23-24].
[5] [Doc. No. 48-3 pp. 5-7].
[6] [Doc. No. 41-3, pp. 9-21].

Powell posed a risk of suicide on March 13-14, 2020. The deputies further averred that no other deputy indicated that Powell presented a substantial risk of harm on the night of March 13, 2020.

Several of the affiants saw Powell that night.[7] Milstead testified Powell expressed frustration with his cell mate and asked Milstead to have the cell mate removed. Milstead talked to his supervisor, who told Milstead to remove Powell's cell mate and move him to a different cell.[8] All of the deputies that saw Powell testified Powell did not appear to be in any distress and did not indicate anything to them that he intended to harm himself.

Dr. Boyle testified in his deposition[9] that he saw Powell after the November 9, 2019, incident. Powell was released from suicide watch on November 13, 2019, per Dr. Boyle's recommendation. Dr. Boyle also saw Powell after he was placed on suicide watch the second time on January 23, 2020. Dr. Boyle saw Powell on January 27, 2020, and noted Powell was well oriented, good, had logical speech, and he saw no signs of suicide. He recommended Powell be released from suicide watch. He also recommended Powell return to the clinic in one week. Dr. Boyle did not recall seeing Powell the next week. According to Dr. Boyle's medical chart, the last time he saw Powell was January 27, 2020.

OCC's Policy and Procedure Manual[10] has a Suicide Prevention and Intervention Policy[11] ("Suicide Prevention Policy") that requires all staff with responsibility for offender supervision to be trained in the implementation of the program. The Suicide Prevention Policy begins with a medical intake during the booking/intake process to attempt to identify inmates with suicide risks.

---

[7] Crecink, Wells, McLendon, Milstead, Whitton and Bonner.
[8] [ Doc. No. 41-3 pp. 16-17].
[9] [Doc. No. 48-4 pp. 1-7].
[10] [Doc. No. 48-2 pp. 11-19].
[11] [Doc. No. 48-2 pp. 14-15].

The Suicide Prevention Policy also requires Correctional Deputies to be on constant observation and to report any offender to the shift supervisor that exhibits any of the following behaviors:

1. Keeps to himself and speaks very little to others.
2. When he does speak, he says little and usually says it slowly.
3. Extremely restless, pacing up and down, and wrings hands.
4. May cry and be unable to sleep.
5. Quiet and subdued.
6. Threatens suicide.
7. Begins to give away personal items.

In the event an inmate exhibits any of the above behaviors, the Correctional Deputy is required to report the inmate to the Shift Supervisor. The Shift Supervisor will immediately place the offender on suicide watch and do the following:

1. Contact the medical staff.
2. The offender is to be dressed in quilted smock.
3. The offender is to be placed into a holding cell.
4. The offender placed on suicide watch will be observed and logged at least every fifteen (15) minutes.
5. Meals served to offenders on suicide watch will be served on disposable plates and utensils.
6. Only the medical doctor will be able to remove an offender from suicide watch.
7. If an offender is placed on suicide watch, his personal property should be removed from the dorm and stored.
8. An offender on suicide watch will not be allowed to have any property in the cell.

Only the medical doctor will be able to remove an offender from suicide watch. Correctional Deputies are to be provided annual training in suicide prevention and intervention.

Powell was found in his cell the morning of March 14, 2020, where he hanged himself with a towel tied to the shower curtain rod.[12]

---

[12] [Doc. No. 48-5, p. 2, Depo. Of Christopher Hill, and Doc. No. 48-2 p. 9, Depo. Of Warden Paul Campbell].

Guillot filed suit against Russell and Johnson under state and federal law claims of negligence. Under federal law, the standard is whether the Defendants had gained actual knowledge of a substantial risk of suicide and responded with deliberate indifference. *Hare v. City of Corinth, Miss.,* 74 F.3d 633, 650 (5th Cir. 1996). Under state law, the standard is whether the Defendants can be found to have acted negligently under the four-prong inquiry of Louisiana's duty-risk analysis. *Mart v. Hill*, 505 So.2d 1120 (La. 1987).

## II. LAW AND ANAYLSIS

### A. Standard of Review

Summary judgment is appropriate when the evidence before a court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharms. Corp.,* 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate.

5

*Id.* "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In evaluating a motion for summary judgment, courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E & P USA Inc. v. Kerr–McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citations omitted). While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that a genuine issue of material fact exists. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (emphasis added). "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson,* 477 U.S. at 248).

Relatedly, there can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322-23. This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323.

### B. Capacity of Defendants Russell and Johnson

Both Russell and Johnson have been sued only in their official capacities.[13] Official

---

[13] [Doc. No. 29, p. 8] and [Doc. No. 1, pp. 2-3].

capacity suits generally represent another way of placing an action against an entity of which the officer is an agent. *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999).

To hold a municipality or local government unit liable under Title 18 U.S.C. § 1983 for the misconduct of one of its employees, a plaintiff must initially allege that an official policy or custom was the cause-in-fact of the deprivation of rights inflicted. To satisfy the cause in fact requirement, a plaintiff must allege the custom or policy served as a moving force behind the constitutional violation at issue, or that the injuries resulted from the execution of an official policy or custom. The description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory. It must contain specific facts. *Spiller v. City of Texas City Police Dept.*, 130 F.3d 162, 167 (5th Cir.1997).

A plaintiff must identify the policy or custom which allegedly caused the deprivation of her constitutional rights. *Murray v. Town of Mansura*, 76 Fed. App'x 547, (5th Cir. 2003). A policy may not be inferred. *Colle v. Brazos County, Tex.,* 981 F.2d 237, 245 (5th Cir. 1993).

Defendants allege Guillot has failed to identify the existence of an official unconstitutional policy. Additionally, Defendants allege Guillot has failed to allege a "defacto policy" required. A defacto policy requires a persistent widespread practice which, although not authorized by an officially adopted policy, is so common and well-settled as to constitute a custom that fairly represents a municipal policy. *Webster v. City of Houston,* 735 F.2d 838, 842 (5th Cir. 1992), On reh'g, 739 F.2d 993 (5th Cir. 1984) "Isolated acts" cannot generally establish the existence of a custom or practice. *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003). To use prior incidents to prove a custom, they "must have occurred for so long or so frequently that the course of conduct the attribution to the governing body of knowledge that the objectional conduct is the expected, accepted practice." *Webster*, 735 F.2d at 842.

Guillot does not allege or argue that the Defendants' Suicide Prevention Policy is unconstitutional. The crux of Guillot's argument is that Defendants were negligent and/or at fault in failing to place Powell on suicide watch before he died on March 13, 2020. There are no prior incidents alleged with specificity to prove a "defacto policy."

### 1. Pat Johnson Not a Policymaker

As noted, Johnson is only sued in his official capacity. Johnson is alleged to be the Warden of OCC at the time of Powell's death. Johnson is not the Sheriff of Ouachita Parish. Official capacity suits are only viable against persons responsible for formulating an official policy which results in a constitutional deprivation. *Hafer v. Melo*, 112 S.Ct. 358, 361-62 (1991). Under Louisiana law, the Sheriff is the final policymaker for his office. *Craig v. St. Martin Parish Sheriff,* 861 F.Supp. 1290, 1300 (W.D. La. 1994). Therefore, Johnson cannot be sued for official capacity claims. Additionally, as Defendants point out, a suit against Pat Johnson in his official capacity would actually be a suit against OCC, which is not a legal entity capable of being sued. *Williamson v. Garber*, 2020 WL 1244557 at 2-3 (W.D. La. February 5, 2020).

### 2. Constitutionality of OCC Suicide Prevention Policy

As discussed previously, OCC had a Suicide Prevention Policy in place. If a municipal policy is not unconstitutional on its face, a plaintiff must establish that the policy or custom was adopted or maintained with objective deliberate indifference to a prisoner's constitutional rights. *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). Deliberate indifference occurs when the policymakers promulgate or fail to promulgate a policy or custom, despite the known or obvious consequences that constitutional violations will result. *Id.*

The first question is whether OCC's Suicide Prevention Policy is constitutional on its face. The Court finds that it is. The policy takes effect during the intake/booking process. It requires Correctional Deputies to complete a medical intake and forward the intake to the OCC medical unit. The offender is immediately placed on suicide watch if identified as a suicide risk. The policy also requires Correctional Deputies to be on constant observation for listed warning signs and to notify their shift supervisor if any are noted.

The OCC shift supervisor will immediately place the offender on suicide watch, which requires the offender to be placed in a holding cell, safeguards put into place to protect the offender, and for the offender to be observed at least every fifteen minutes. An offender is only removed from suicide watch by a medical doctor.

A plaintiff is also required to show a direct causal link between the municipal policy and the officer's constitutional violation by showing that the policy was the "moving force" behind that violation. This requires a plaintiff to demonstrate that the Suicide Prevention Policy at issue was unconstitutional or was adopted with deliberate indifference to the known and obvious fact that such constitutional violation would result. *Webb v. Town of St. Joseph*, 925 F.3d 209, 219 (5th Cir. 2019). The Guillot has failed to identify any policy, practice, or custom which served to violate Powell's constitutional rights. Guillot's claims that Defendants were negligent in failing to see that Powell needed to be on suicide watch, not that there was a constitutional violation with OCC's Suicide Prevention Policy.

Under federal law, negligence is not the standard here. The standard is whether the Correctional Officers at OCC had gained actual knowledge of a substantial risk of suicide and responded with deliberate indifference. *Hare v. City of Corinth, Miss.,* 74 F.3d 633, 650 (5th Cir. 1996). That is a hard standard to meet, especially in this case. The summary judgment

evidence shows that OCC was actually following its Suicide Prevention Policy because OCC put Powell on suicide watch twice, on November 9, 2019, and again on January 23, 2020.[14]

Guillot maintains that Powell should have been on suicide watch on March 13, 2020. Powell was not put on suicide watch on either February 18, 2020, or on March 3, 2020. On February 18, 2020, Powell was placed on what Defendants referred to as "heightened supervision" when Powell was acting distant, had a blank stare, abrasions were found on this wrist, and he told the deputies he "needed help."

Powell was also not placed on suicide watch on March 3, 2020, when he made a claim that he thought he had been raped when he was asleep.[15] But even if Powell had been placed on suicide watch on February 18, or on March 3, 2020, Powell did not commit suicide until March 13, 2020. In the two occasions Powell was placed on suicide watch, he was released from suicide watch by Dr. Boyle.[16]

There is no evidence presented by Guillot to show that Powell should have been placed on suicide watch prior to his death on March 13, 2020. There is also no evidence that OCC Correctional Officers were deliberately indifferent to a need to put Powell on suicide watch. Crecink, Wells, McLendon, Milstead, Whitton, and Bonner all saw Powell the night of his death. With the exception of McLendon, who had been hired in January 2020, all of these Deputies had suicide prevention training, all said Powell did not appear to be in any distress, and that Powell did not indicate anything to them that he intended to harm himself.[17] Milstead actually talked to

---

[14] [Doc. No. 48-2, pp. 25-26].
[15] Video surveillance verified the rape did not take place.
[16] [Doc. No. 48-4, pp. 1-5].
[17] [Doc. No. 41-3, pp. 9-21].

Powell that night. Powell expressed frustration with his cell mate and asked Milstead to have his cellmate removed, which Milstead did.[18]

### C. Supervisory Liability

Because Guillot acknowledges no individual capacity claims are brought against either Defendant, there can be no supervisory liability. Even if there could be, the result would be the same. In an Eighth Amendment act or omission case, for an individual defendant, a plaintiff must establish that the official acted with subjective deliberate indifference to prove a violation of his constitutional rights. *Flores v. County of Hardeman Tex.,* 124 F.3d 736, 738-39 (5th Cir. 1997). For the reasons previously discussed, there is no evidence the Defendants acted with deliberate indifference. "Deliberate indifference" is an extremely high standard to meet.[19] Guillot has not met that standard here.

Because there is no vicarious liability in a Section 1983 action,[20] Guillot would have to prove there was a failure to train or supervise the officers involved, there was a causal connection with the alleged violation, and the failure to train or supervise amounted to deliberate indifference to the Powell's constitutional rights. *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2003). No evidence has been presented that the Correctional Officers had not been properly trained and for reasons earlier discussed, there is no deliberate indifference here. Defendants presented substantial evidence as to the training of OCC's Correctional Officers.[21]

The failure to detect latent, as compared to manifest, suicidal tendencies does not rise to the level of a constitutional violation. *Whitt v. Stephens Cty.* 529 F.3d 278, 284 (5th Cir. 2008).

---

[18] [Doc. No. 41-3, pp. 16-17].
[19] *Taylor v. Bayou Corr. Center*, 2021 WL 6118739 at 9 (W.D. La. December 7, 2021).
[20] *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).
[21] [Doc. No. 41-5].

Even if there were individual capacity claims against Russell or Johnson, there has been neither an allegation nor evidence to show either Sheriff Russell or Warden Johnson knew Powell posed a suicide risk.

### D. Qualified Immunity

Even if Defendants were sued in their individual capacities, both Russell and Johnson would be entitled to qualified immunity. The doctrine of qualified immunity insulates government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73, L. Ed. 2d 396 (1982). Qualified immunity is an immunity from suit rather than a mere defense to liability and is effectively lost if a case is permitted to go to trial, thus qualified immunity questions should be resolved through summary judgment when the underlying facts are not in dispute. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86, L. Ed. 2d 411 (1985). Qualified immunity questions should be resolved at the earliest possible stage in litigation. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991).

As indicated by *Saucier v. Katz*, 533 U.S. 194, 200, 121 S. Ct. 2151, 150 L. Ed 2d 272 (2001), in determining whether qualified immunity applies, the first inquiry is whether a constitutional right would have been violated on the facts alleged. Only after deciding that question may a court turn to the question whether the right at issue was clearly established at the relevant time. This procedure was subsequently altered to declare that *Saucier's* procedure should not be regarded as an inflexible requirement but noted the *Saucier* procedure is often beneficial. *Pearson v. Callahan*, 555 U.S. 223, 227, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

In this case, following the *Saucier* procedure is appropriate. This Court begins with the question of whether a constitutional right would be violated on the facts alleged. The facts of this incident are set out in great detail in Section I of this Memorandum Ruling.

The inquiry requires analyzing the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). This question is analyzed from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. Police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. *Id*. at 396-397.

The Court can decide one question or both under *Saucier*.[22] The dispositive question is whether the violative nature of the particular conduct is clearly established. *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008). That is because qualified immunity is inappropriate only where the officer had "fair notice" in light of the specific context of the case, not as a broad general proposition, that his particular conduct was unlawful. *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004).

The burden of proof in a Section 1983 action is on the plaintiff. The burden is heavy. A right is "clearly established" only if relevant precedent has placed the constitutional questions beyond debate. *Ashcroft v al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011).

It is beyond debate that the duty to keep inmates safe includes a responsibility on the part of prison officials to provide adequate protection against a prisoner's known suicidal impulses. *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 107 (5th Cir. 1993). However, Defendants, did not violate any clearly established precedent that squarely governs the specific facts of this case.

---

[22] *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019).

Qualified immunity was intended to address decisions such as the one at issue here, that is, second-guessing whether or not to put Powell under suicide watch and/or not to keep him indefinitely under suicide watch. The Court finds that Both Russell and Johnson are entitled to qualified immunity.

**E.     State Law Claims**

In addition to federal claims, Guillot also alleges negligence and vicarious liability under Louisiana law. Under La. Civ. Code art. 2315, liability is determined by using the four-prong inquiry under a duty/risk analysis.

In order for liability to attach under a duty/risk analysis, all four factors must be affirmatively answered for Guillot to recover. These factors are: (1) whether the conduct in question a cause-in-fact of the harm which occurred; (2) whether the Defendants owed a duty to Plaintiff; (3) whether that duty was breached; and (4) whether the risk, and harm caused, was within the scope of protection afforded by the duty breached. *Mart v. Hill*, 505 So.2d 1120 (La. 1987).

In *Scott v. State*, 618 So.2d 1053 (1st Cir. 1993), the court held that prison authorities owe a duty to use reasonable care to protect inmates from harm and that this duty extends to protecting inmates from self-inflicted injury.

In *Misenheimer v. West Baton Rouge Parish Sheriff's Office*, 677 So.2d 159 (1st Cir. 1996), an inmate trustee gained access to a deputy's handgun while working unsupervised. The inmate then used the handgun to commit suicide. Because no one at the facility had any knowledge or information of the inmate's suicidal tendencies, his use of the handgun to commit suicide "was neither foreseeable, nor easily associated with any duty that was allegedly breached."

In *Leonard v. Torres,* 2016-1484 (La. App. 1 Cir. 9/26/17), a pretrial detainee hanged himself with his shoelaces. The detainee's wife filed a lawsuit against the Sheriff of Pointe Coupee Parish and the Warden of Pointe Coupee Detention Center for failing to prevent the detainee's suicide and for allegedly failing to properly train and hire correctional center employees. The trial court denied summary judgment, but the appeals court reversed and granted summary judgment to the defendants. The appeals court stated that prison officials only owe a duty to prevent self-inflicted harm that is "reasonably foreseeable." The evidence must establish that the prison authorities either knew or should have known of an inmate's suicidal tendencies.

As discussed, Powell was placed on a suicide watch twice, on November 9, 2019, and again on January 23, 2020. In November 2019, during Powell's arrest, Powell made a statement to Corporal Irving that he asked the victim of his burglaries to kill him, so he was placed on suicide watch. Powell was released from suicide watch by Dr. Boyle on November 13, 2019.[23]

On January 23, 2020, Powell contacted Dep. Herron from his cell and stated he was suicidal. Powell was moved and placed on suicide watch a second time. Powell was released from suicide watch by Dr. Boyle on January 27, 2020.[24]

On February 18, 2020, Powell was moved due to strange behavior and having abrasions on his wrist. The Deputy stated Powell was acting distant and had a blank stare.[25] Powell was not placed on suicide watch, and there was no evidence that Powell made any attempt to commit suicide. Powell was placed on "heightened supervision." There is no definition of that term in OCC's Policy Manual.[26]

---

[23] [Doc. No. 48-4, pp. 1-5, Depo. Of Dr. Boyle].
[24] [Doc. No. 48-4, p. 6, Depo. Of Dr. Boyle].
[25] [Doc. No. 48-2 p. 20]
[26] [Doc. No. 48-2 p. 6 Depo of Warden Paul Campbell].

The last incident that occurred involving Powell, prior to his death, was on March 3, 2020. On this date, Powell verbally reported to staff that he had been raped in cell E-15 on February 27, 2020, and he demanded a cell to himself. Powell's statement was that someone removed him from his bunk as he slept. He did not know who had raped him. Powell stated the unknown person undressed him, raped him, re-clothed him, and placed him back on his bunk without ever waking Powell. Powell claimed someone had put a sleeping pill in his oatmeal. Camera footage was reviewed, and it was determined that no rape occurred.[27]

There were no other incidents involving Powell reported between March 3, 2020, and March 13, 2020. On the night of his death, several Correctional Officers saw Powell. According to their affidavits,[28] none of the deputies had any knowledge that Powell posed a risk of suicide. Other than wanting his cell mate removed,[29] Powell did not appear to be in any distress and did not indicate anything to the Correctional Officers that indicated he intended to harm himself.

There was simply no reason to have placed Powell on suicide watch on March 13, 2020. Although Powell had been placed on suicide watch twice since November 2019, there were behaviors exhibited by Powell that led to him being placed on suicide watch on those occasions. On March 3, 2020, ten days prior to Powell's death, Powell complained of being raped in his sleep, which was determined to be unfounded by the video cameras. None of the behaviors listed on OCC's Suicide Prevention and Intervention Policy[30] were exhibited by Powell.

The Defendants followed their Suicide Prevention and Intervention Policy. There were no behaviors exhibited by Powell that indicated Powell was suicidal. Therefore, under the facts

---

[27] [Doc. No. 48-3 pp 5-7].
[28] [Doc. No. 41-3 pp. 9-21]
[29] [Doc. No. 41-3 pp. 16-17].
[30] [Doc. No. 48-2 pp. 14].

of this case, this Court believes the Defendants did not owe a duty to place Powell on suicide watch and are not legally responsible for Powell's death.

### III. CONCLUSION

For the reasons set forth herein, Defendants' Motion for Summary Judgment [Doc. No. 41] is GRANTED.

MONROE, LOUISIANA, this 14th day of April 2022.

_____
**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**